UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CARL AUGSBERGER, Plaintiff<br>vs.<br><br>UNUM PROVIDENT CORP., and NEW YORK LIFE INSURANCE COMPANY Defendants | CIVIL ACTION NO. 05CV30047-MAP |

**AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY**

**Introduction**

Plaintiff brings this civil action seeking damages, inter alia, for failure to affirm or deny insurance coverage within a reasonable time, and failure to reach a prompt settlement once liability had become reasonably clear. As a result of injuries suffered, Plaintiff brings the following claims against each of the Defendants: M.G.L. c. 93A, §9, and Breach of Contract.

**Parties**

1. Plaintiff, Carl Augsberger is an individual who resides at 82 Maple Street, West Springfield, Massachusetts 01089.

2. Defendant Unum Provident Corporation ("Unum"), is a corporation duly organized by law with a principal place of business in Chattanooga, Tennessee.

3. Defendant New York Life Insurance Company ("New York Life"), is a corporation duly organized by law with a principal place of business in New York, New York.

## Facts

4. The Plaintiff and New York Life entered into a contract for disability income insurance on August 14, 1991. New York Life entered into a reinsurance agreement with Paul Revere, a subsidiary of Unum Provident, under which Paul Revere administers and services, as an agent for New York Life, its individual disability income policies. Accordingly, New York Life and Unum Provident are each liable for their actions as individuals, and are additionally liable through their agency relationships with each other. The transaction did not affect the material terms of the insurance contract. Pertinent and material provisions include the following: Unrestricted Own Occupation, Cost of Living Benefit, Residual Disability, Primary Automatic Benefit Increase, and Waiver of Premium Benefit.

5. For these provisions, and indeed, for the insurance coverage generally, the Plaintiff paid a premium of $2,473.00 per year. In return, Unum promised to provide to The Plaintiff monthly benefits in the event of a total disability of $5,000.00.

6. Also, in the event that the Plaintiff, due to a disability, could not realize the monthly income he had earned when he was not disabled, Unum would provide a

residual benefit to supplement the Plaintiff's monthly income to bring the total up to $5,000.00.

7. In April, 1997, the Plaintiff submitted a claim for disability. At that time, he was undergoing essentially a nervous breakdown related to his job. He was suffering from several ailments including but not limited to depression and anxiety disorder.

8. Soon after he submitted his claim, New York Life requested that he provide certain information to process his claim. These items included a supplemental claim form, 1996 and 1997 tax forms, copies of fax filing extensions, information on the workers compensation claim and copies of any related documents, an explanation of the BuSpar medication the Plaintiff was taking and information on the prescribing physician, a supplemental claim form from the Plaintiff's physician, information regarding whether he had received any salary continuation benefits, and specific dates.

9. Approximately seven months later, the Plaintiff received yet another request for information. This request was for information regarding the last date he worked; a detailed and lengthy form for him to complete entitled "Description of Occupation"; a request for an explanation of why the Plaintiff "waited" seven months to file his claim instead of the specified 30 days in the policy; complete copies of tax returns for 1990, 1991 and 1996 including schedules and attachments, W-2's and 1099's; a copy of the workers compensation application for benefits; a supplemental claim form from the Plaintiff; and a supplemental claim from his physician.

10. The Plaintiff forwarded the requested information within one month.

11. Approximately one month later, New York Life again submitted a detailed list of items it was requesting in order to process the Plaintiff's claim. This list included a request for medical records from the Plaintiff's treating physician, Dr. Kevin Schmidt, along with an evaluation form; an evaluation form from the Plaintiff's psychologist, Dr. Mark Elin; additional information from his then employer, Penske Truck Leasing; a copy of the workers compensation decision; supplemental claim form from Dr. Schmidt; and copies of the Plaintiff's 1996 and 1997 tax forms.

12. Within one month the Plaintiff provided the requested information.

13. Almost one year after the Plaintiff had first submitted his claim, New York Life, apparently still processing his request for benefits, sent a third request for information in March, 1998. This time, New York Life sought medical records from Dr. Elin; medical records from Dr. Schmidt; a copy of the workers compensation denial of benefits letter; and a supplemental claim form from Dr. Schmidt. New York Life also informed the Plaintiff that it would have a consulting psychologist review his claim after it had received the foregoing.

14. After waiting almost one year, the Plaintiff received the news that New York Life would pay benefits from April 14, 1997 through January 10, 1998 (less the 180 day waiting period.)

15. However, regarding benefits for subsequent months, New York Life was requesting additional information, including the Plaintiff's medical records in connection with his treatment with Dr. Schmidt from the time he first saw Dr. Schmidt. These records predated the Plaintiff's claim of April, 1997.

16. A month later, New York Life again requested this information. After not receiving such information again in June, 1998, New York Life closed the claim in August, 1998.

17. The claim was reopened. New York Life submitted yet another substantial request for information including, but not limited to, a completed Form 1 from the Plaintiff; completed Form 2 from Dr. Schmidt; tax returns for 1998 including all schedules and attachments; and a detailed narrative of the Plaintiff home and work life since January 1998.

18. On March 28, 2000, the Plaintiff submitted the "Insured's Supplementary Statement of Claim" form.

19. New York Life followed up its request in August 2000, wherein it requested the following to reopen the Plaintiff's claim: a complete and detailed reply to its letter dated October 15, 1998; a statement regarding the Plaintiff's salary continuation benefits; a status report on the appeal of the workers compensation denial; copies of the tax returns for 1996, 1997, 1998 and 1999; the name, address and phone number of the physician who prescribed the BuSpar; Form 1 from the Plaintiff; Form 2 from each physician; a detailed account of any work performed by the Plaintiff; a completed Description of Occupation" form; a detailed narrative of the Plaintiff's life since January 1998; and Dr. Schmidt's entire medical file regarding the Plaintiff.

20. In September 2000, Unum sent another letter requesting the Plaintiff's response to New York Life's letter of August 2000. The Plaintiff replied and provided the information.

21. Despite this, Unum again requested additional information in a letter dated October 4, 2000. It now wanted the following: copies of Schedule C and personal tax returns; updated medical records from Dr. Schmidt and any other doctor the Plaintiff had seen since 1997; since Dr. Schmidt had indicated that the Plaintiff was completely disabled from October 3, 1998 to October 4, 2000, Unum also requested monthly profit and loss statements from October 1, 1998 through October 4, 2000; a status report on the appeal of the workers compensation denial; complete copies of business and personal tax returns for 1999 including all schedules and attachments; the name of the physician who prescribed BuSpar; a completed "Daily Activities" form; and continuing monthly

Case 3:05-cv-30047-MAP Document 13-1 Filed 09/12/2005 Page 11 of 18

progress reports. Additionally, Unum expressed that it could not understand the reasons for why the Plaintiff could not return to work in a full time capacity in his occupation.

22. In January 2001, Unum also wrote directly to Dr. Schmidt requesting medical records and Psychiatric Assessment Forms.

23. In response to a March 2001 visit by Unum field representative, Robert Murphy, the Plaintiff forwarded (within two days) information regarding all medications he was taking for treatment.

24. On March 29, 2001, Unum received by certified mail, a completed "Psychiatric Assessment Form", in which Dr. Schmidt unequivocally stated the Plaintiff's latest visit with him was March 28, 2001; that the Plaintiff continued to suffer from clinical depression and generalized anxiety disorder; and that he was being treated with Wellbutrin, BusSpar, among other prescription medications. Dr. Schmidt stated that the Plaintiff would be unable to return to the high-stress corporate atmosphere of his job, indefinitely; and that the Plaintiff's condition continued to disable him from his previous type of employment and income level. [See Dr. Schmidt's evaluation, attached hereto as Exhibit A.]

25. On April 18, 2001, Unum informed the Plaintiff that it had given Dr. Schmidt's letters to its in-house psychiatric consultant for review. Additionally, Unum requested

from the Plaintiff an updated progress report, along with an updated progress report from the Plaintiff's physician, and all information requested in its letter dated October 4, 2000.

26. Later that month, Unum again sent a letter seeking more treatment notes from Dr. Schmidt. On April 26, 2001, Dr. Schmidt forwarded the requested information.

27. On May 2, 2001, Unum paid benefits for January 11, 1998 through June 11, 2000.

28. On June 12, 2001, Unum requested updated medical forms from Dr. Schmidt and Dr. Elin, and sought a progress report from the Plaintiff and Dr. Schmidt, respectively.

29. On or around June 13, 2001, Dr. Schmidt submitted an "Attending Physician's Statement" which stated that the Plaintiff would probably never be able to work without restriction. [See Exhibit B attached hereto.]

30. On June 20, 2001, the Plaintiff submitted yet another progress report to Unum.

31. Unum requested more information in its letter dated July 6, 2001. Specifically, it sought more medical documentation from Drs. Schmidt and Elin, monthly progress reports from both the Plaintiff and Dr. Schmidt; and both business and personal tax returns for 2000.

32. Unum followed up this request a little more than one month later and stated that Drs. Schmidt and Elin had not responded to its request for information, and again requested the 2000 business and tax returns.

33. Finally, on September 25, 2001, Unum informed the Plaintiff that it was rejecting his claim for either total or residual disability. This rejection was ostensibly based upon its determination, despite the recent reports from Dr. Schmidt, that Unum's "in-house psychiatric consultant" reviewed the Plaintiff's file and Unum determined that that "there does not appear to be sufficient documentation that would limit or restrict your ability to perform the duties of your occupation on a full-time basis."

34. Moreover, in support of its denial, Unum referenced a stale (dated February 15, 1998) evaluation report by Dr. Elin indicating that the Plaintiff could perform all his occupational duties, just not "at Penske." Unum apparently ignored the more recent reports by Dr. Schmidt which steadfastly maintained that the Plaintiff remained disabled from his former occupation and which indicated that the Plaintiff continued to treat under Dr. Schmidt's care (with regular visits) regarding his disability.

35. Unum's reliance on Dr. Elin's evaluation, and disregard of Dr. Schmidt's more recent evaluations was even more surprising to the Plaintiff, especially because earlier, in a correspondence dated March 11, 1998, Unum had indicated that Dr. Schmidt was the physician certifying the Plaintiff's disability.

36. The Plaintiff proceeded to request his entire file at Unum. On May 30, 2002, Unum responded by producing selected documents, but not the entire file. The Plaintiff again requested that Unum reopen his claim.

37. On December 13, 2002, Unum requested more information. This time, the list included requests for copies of medical records from Dr. Schmidt from March 27, 2001 to the present; medical records from Dr. Elin; the name of the physician the Plaintiff had consulted in November, 2002: copies of both business and personal tax returns for 2000 and 2001; monthly profit and loss statements for the entire year of 2002; and another completed claim form.

38. On February 14, 2003, Unum notified the Plaintiff that it was rejecting his claim for residual disability. This rejection was apparently based in an improved diagnosis of the Plaintiff's adjustment disorder, despite Dr. Schmidt's reports that the Plaintiff continues to suffer from clinical depression and generalized anxiety disorder. The letter informed the Plaintiff that if he did not submit an appeal within 90 days, Unum's decision would be final.

39. On May 13, 2003, the Plaintiff sent a written appeal to Unum.

40. On December 19, 2003, Unum rejected the Plaintiff's appeal. This rejection was also based on in-house psychiatric and physician's reports contrary to the evaluations done by Drs. Elin and Schmidt.

41. On August 10, 2004 the Plaintiff sent a demand letter in accordance with M.G.L. c. 93A, §9(3) to Defendant Unum Provident Corp. [Attached as Exhibit C]. On April 15, 2005 the Plaintiff sent a demand letter in accordance with M.G.L. c. 93A, §9(3) to Defendant New York Life Insurance Company. [Attached as Exhibit D]

**COUNT I**

**(Violation of M.G.L. c.93A against Defendant Unum Provident Corp)**

43. Plaintiff Carl Augsberger realleges Paragraphs 1 through 39 supra., and incorporates the same by reference as if originally stated herein.

44. Defendant Unum Provident Corp.'s use of improper insurance claim settlement practices including, inter alia: failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies; failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies; refusing to pay claims without conducting a reasonable investigation based upon all available information; failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed; failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds; and attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to

written or printed advertising material accompanying or made part of an application; constitute a violation of M.G.L. c. 176D, and are therefore a violation of M.G.L. c. 93A.

**COUNT II**

**(Breach of Contract by Unum Provident Corp)**

45. Plaintiff Carl Augsberger realleges Paragraphs 1 through 39 supra., and incorporates the same by reference as if originally stated herein.

46. The Plaintiff and Defendant Unum Provident entered into a contract, and the Plaintiff paid the Defendant for disability insurance coverage. The Defendant then breached this contract in refusing to pay the Plaintiff disability insurance compensation.

**COUNT III**

**(Violation of M.G.L. c.93A against Defendant New York Life Insurance Company)**

47. Plaintiff Carl Augsberger realleges Paragraphs 1 through 39 supra., and incorporates the same by reference as if originally stated herein.

48. Defendant New York Life Insurance Company's use of improper insurance claim settlement practices including, inter alia: failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies; failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies; refusing to pay claims without conducting a reasonable investigation based upon all available information; failing to affirm or deny

coverage of claims within a reasonable time after proof of loss statements have been completed; failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds; and attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application; constitute a violation of M.G.L. c. 176D, and are therefore a violation of M.G.L. c. 93A.

**COUNT IV**

**(Breach of Contract by New York Life Insurance Company)**

49. Plaintiff Carl Augsberger realleges Paragraphs 1 through 39 supra., and incorporates the same by reference as if originally stated herein.

50. The Plaintiff and Defendant New York Life Insurance Company entered into a contract, and the Plaintiff paid the Defendant for disability insurance coverage. The Defendant then breached this contract in refusing to pay the Plaintiff disability insurance compensation.

**Prayer for Relief**

51. Based on the foregoing, the Plaintiff prays this Court to:

a. Award Plaintiff the compensation due under his insurance contract with the Defendant;

b. Award Plaintiff his attorney fees and costs of litigation;

c. Grant such other relief as is just and equitable.

**Jury Demand**

The Plaintiff hereby demands a trial by Jury upon all issues raised here.

THE PLAINTIFF
BY HIS ATTORNEY

DATED: 7/27/05

THOMAS A. KENEFICK, III, ESQ.
73 Chestnut Street
Springfield, MA 01103
(413) 734-7000
(413) 731-1302 – Fax
BBO# 267620

# EXHIBIT A

Case 3:05-cv-30047-MAP Document 13-2 Filed 09/12/2005 Page 2 of 19



UNUM.

*Protecting everything you work for*

JANUARY 17, 2001

DR. KEVIN SCHMIDT
300 STAFFORD STREET
SPRINGFIELD, MA 01104

SECOND REQUEST

Re: Carl Augsberger, Sr.
SOCIAL SECURITY #: 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
DATE OF BIRTH: 5/25/53
OUR CLAIM # 13-H3192623-001

DEAR DR. SCHMIDT:

WE ARE CONSIDERING A REQUEST FOR DISABILITY BENEFITS FROM THE ABOVE POLICYHOLDER. AS PER COPY ATTACHED, WE HAVE BEEN AUTHORIZED TO OBTAIN INFORMATION WE NEED TO EVALUATE OUR INSURED'S CLAIM FOR BENEFITS.

TO DETERMINE OUR LIABILITY, IT IS NECESSARY THAT WE HAVE COPIES OF THE INSURED'S MEDICAL RECORDS COVERING ALL DATES OF TREATMENT, FINDINGS, DIAGNOSES, AND REFERRALS. WITHOUT THIS INFORMATION, WE MAY NOT BE ABLE TO CONSIDER BENEFITS UNDER MR. AUGSBERGER'S DISABILITY POLICY. IN ADDITION, WE ASK YOUR ASSISTANCE IN COMPLETING THE ENCLOSED PSYCHIATRIC ASSESSMENT FORM.

PLEASE SEND US THESE COPIES AS SOON AS POSSIBLE. WE REALIZE YOUR TIME IS VALUABLE AND WE APPRECIATE YOUR EFFORTS. WE WILL, THEREFORE REIMBURSE A REASONABLE FEE FOR PROVIDING THIS INFORMATION. PLEASE INCLUDE YOUR TAX IDENTIFICATION NUMBER WITH YOUR BILL. A RETURN ENVELOPE IS ENCLOSED FOR YOUR CONVENIENCE.

THANK YOU FOR YOUR PROMPT ATTENTION.

SINCERELY,

[signature]

KATHRYN J. ROBERTS, ALHC, ACS
LEAD CUSTOMER CARE SPECIALIST
THE PAUL REVERE LIFE INSURANCE COMPANY
1-888-226-7959, EXT. 6023

ENC.: PA, RE, PAF

UnumProvident Companies
Paul Revere Insurance Group
18 Chestnut Street
Worcester, MA 01608

# Psychiatric Assessment Form

*(Please answer ALL questions - Please Type or Print legibly )*

**1. IDENTIFYING INFORMATION:**

**DATE:** 3/25/01 **D.O.B.:** 5/25/53 **SEX:** M **CLAIM #**

**PATIENT:** Carl Augsburger, Sr.

**ADDRESS:** 155 Ohio St, WSpfld

**2. CLINICAL INFORMATION:**

DATE OF INITIAL VISIT: 3 / 25 / 1997 (M D Y) DATE OF LAST VISIT: 3 25 2001 (M D Y) NUMBER OF VISITS TO DATE: 19 office visits, Numerous phone consultation

DIAGNOSIS: (DSM-IV CODES):

AXIS I a. Clinical Depression
b. Generalized Anxiety Disorder
AXIS II
AXIS III
AXIS IV PSYCHOSOCIAL & ENVIRONMENTAL PROBLEMS:

___problems with primary support group SPECIFY:
___problems related to social environment SPECIFY:
___educational problems SPECIFY:
___occupational problems SPECIFY:
___housing problems SPECIFY:
___economic problems SPECIFY:
___problems with access to health care services SPECIFY:
___problems related to interaction with legal system/crime SPECIFY:
___other psychosocial and environmental problems SPECIFY:

AXIS V GLOBAL ASSESSMENT OF FUNCTIONING SCALE:

Current GAF:_____ Highest GAF in past year:_____

MARITAL STATUS: ☐ Single ☒ Married ☐ Separated ☐ Divorced ☐ Widow/er

**3. MEDICATION:** (if being administered)

| | Medication | Dosage | Date Started | Response | Date D/C'd |
|---|---|---|---|---|---|
| 1. | Wellbutrin SR | 150mg b.i.d | 12/98 | (previously on Zoloft | 3/92 → 12/98) |
| 2. | Buspar | 10mg t.i.d | before 3/97 | | |
| 3. | Viagra | 50mg p.r.n | 10/99 | | |
| 4. | Lopressor | 2mg tid | | | |
| 5. | Prilosec | 20mg qd | before 3/97 | | |
| | Lipitor | 40mg qd | 6/99 | | |

Lotrel 10/5 ... po qd ... 3/25/01

(Revised Jan. 1997)

**4. HISTORY:**

Please provide a detailed account of the significant history of your patient. How did they come to be treated by you? (Include the name of any referral source) Are there other current treatment providers? Please include any past history of treatment, both outpatient or hospitalizations (Please include names of hospitals, treaters and dates). Briefly describe your patient's psychiatric history, precipitating factors, symptom progression, as well as familial history of psychiatric disorders.

Pt [illegible] in my office practice (since 1992) - [illegible] hypert[illegible] & Irritable Bowel Disease, COPD.

Beginning in early 1997, patient related to me significant workplace stress/ [illegible] that lead to a profound generalized anxiety / clinical depression. Pt left [illegible] job in April 1997 → severe depression, [illegible] ↓ sleep, ↓ energy, ↓ libido, attention span, concentration. Necessitated clinical psychotherapy & pharmacologic intervention w/ SSRI. Inpatient hospitalization was even contemplated! Pt was CLEARLY totally disabled for all types of employment from Spring 1997 → Fall 1998. Pt was then able to begin work in a different, but related field of truck repair. However, given the permanent impact to self-esteem, concentration, attention span, pt will continue to be disabled from returning to his previous position, at [illegible] type, in corporate [illegible]/sales.

**5. DRUG AND ALCOHOL USE HISTORY:**

Please describe and assess your patient's current and past use of alcohol and/or drugs and its impact? Are you aware of any history of abuse or dependency? Is there any history of past treatment? (Please specify)

No significant problem

**6. PRESENTING CONDITION:**

A. What clinical symptoms are currently reported by your patient? (Please list)

Shortened attention span — Insomnia / Hypersomnolence
Episodic fatigue — Irritable Bowel Syndrome exacerbation
↓ libido, appetite — ↓ self esteem

B. Findings of your most recent Mental Status Exam

Alert & Oriented X3
↓ affect
Sl. impaired attention span.

C. Have there been any other objective assessments / psych. tests / lab reports etc. which might support reported limitations (Please attach results) Still periodic [illegible] assessments w/ [illegible]

PAGE 2

**6. PRESENTING CONDITION CONTINUED**

D. Extent of Functional Deficits:

1. Which occupational duties can your patient continue to perform as required by their occupation at time of disability?

See Question #1

2. Which clinical symptoms you have observed, impair occupational performance? Which occupational duties is your patient unable to perform as a result of these impairments?

Corporate setting, boardroom presentation, large sales gatherings, carrying multiple accounts — cannot adequately perform as in previous position

E. Obstacles to Recovery:

Are there any specific factors (environmental, administrative, familial, economic, medical, legal or occupational) which are interfering with your patient's return to work?

Rx is ongoing & will continue, likely, 1 delay

**7 TREATMENT**

A. What treatment is currently being provided? (Please specify the frequency, modality, and length of treatment sessions.)

Current episodic Psychotherapy w/ Dr. Mark [illegible]
Wellbutrin-SR + Buspar

B. What are the goals of the treatment program and anticipated time to reach each goal?

Continued improvement w/ energy, attention span, self-esteem.
↑ Hours @ work

C. What is the patient's response to treatment to date?

Slow, but steadily



**7. TREATMENT CONTINUED**

D. If ancillary therapy has been recommended, tried, or is ongoing, please describe. Is your patient in any self group or support groups?

Continued f/u

**8. VOCATIONAL STATUS**

A. When do you feel your patient can return to his/her occupation? Pt will be unable to return to high-pressure corporate environment @ work, indefinitely

B. Will the nature of your patient's condition prevent a resumption of his or her occupation? Yes ✓ No____

C. If yes, please explain why your patient will be unable to resume his or her regular occupation.
Significant depression, anxiety c̄ work related above that really [illegible] patient from returning to a similar position

D. Have you discussed vocational rehabilitation (i.e. job modification, restructured work schedules, stress reduction techniques, vocational counseling) with your patient? (Please be specific):
Yes. Patient working in a related field (truck repair), as opposed to corporate accounts in vehicle leasing – his previous occupation

**9. COMMENTS:**

Is there any additional information you wish to add that will give us a better understanding of your patient's condition?
Though pt has made great strides in past year, his level of psychological impairment, & type, continue to disable him from his previous type of employment & income level.

Kevin Edward Schmidt, MD — Internal Medicine — (413) 736-1569 — Fax (413) 746-[illegible]

Name of Attending Physician (please print) — Degree/Specialty — Phone (include area code)

300 Stafford St, #263 ; Springfield, MA 01104-3581

Street Address, City/Town, State, Zip Code

[signature] — 3/25/[illegible] — 04-3072001

Signature — Date Signed — T. I. N. #

**Please return this assessment to the address on front**

Case 3:05-cv-30047-MAP Document 13-2 Filed 09/12/2005 Page 7 of 19

NEW YORK LIFE INSURANCE COMPANY 51 Madison Avenue, New York, N.Y. 10010
NEW YORK LIFE INSURANCE AND ANNUITY CORP. (A Delaware Corporation)
NYLIFE INSURANCE COMPANY OF ARIZONA (Not Licensed in Every State)

# AUTHORIZATION

INSURED'S NAME: Carl A. Augsberger, Sr.
*(Name of person on whom information is being sought)*

I AUTHORIZE information concerning me to be released to New York Life. New York Life includes: the companies named above; its agents; its employees; its subsidiaries; its affiliates; and acting on its behalf: attorneys, reinsurers, insurance support groups, and independent administrators. That which can be released includes, but is not limited to, all data about: medical advice; medical care; medical treatment; medical examinations or tests; prescriptions; medical diagnosis and prognosis; HIV infection; any disorder of the immune system including Acquired Immune Deficiency Syndrome (AIDS) or Aids Related Complex (ARC); mental or emotional illness; the use of drugs; the use of alcohol; other insurance coverage; employment history; earnings or finances; driving records or information otherwise needed to determine policy claim benefits due me. This information can be released by any: doctor, hospital, clinic, other medical facility or provider of health care; pharmacies; consumer reporting agency; insurance support organization; the Social Security Administration; the Internal Revenue Service; the Veteran's Administration; offices of the government; employers; insurance companies; group policyholders; benefit plan administrators or any other organization or person having any knowledge of me or my health.

I AUTHORIZE New York Life to request a report from the Medical Information Bureau (MIB), which is an association of life insurance companies that operates the Health Claims Index (HCI) on behalf of subscriber insurers. An HCI report contains the date(s) of past or present claims filed by me, and also identifies the insurance company to which such claims were submitted, but does not contain medical or other personal information. I understand New York Life will report to MIB the date(s) of any past or present claims filed by me. I understand that waiver of life insurance or annuity premium claims approved by New York Life will not be reported to MIB.

I AGREE the information obtained with this Authorization may be used by New York Life to determine policy claim benefits with respect to me. A photocopy or facsimile copy of this Authorization form is as valid as the original and I may request a copy of it. This form is valid from the date shown below for the duration of the claim. New York Life may request an updated Authorization at any time in order to evaluate my eligibility for policy claim benefits.

I UNDERSTAND that if I revoke or fail to sign this Authorization or alter its content in any way it may affect the handling of my claim or cause the denial of benefits under my policy.

7-27-00
**DATE**

**INSURED'S SIGNATURE***
(Insured or Insured's authorized representative)

**Relationship if other than Insured**

* If the subject of information is a minor or is incapacitated, parent or Guardian must sign. Attach Proof of Guardianship if applicable. If subject of information is deceased, Personal Representative or next of kin must sign.

22030 10/98

Case 3:05-cv-30047-MAP Document 13-2 Filed 09/12/2005 Page 8 of 19

U.S. Postal Service
CERTIFIED MAIL RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)

7000 0520 0024 9415 8487

WORCESTER, MA 01608

| | | |
|---|---|---|
| Postage | $ 2.44 | UNIT ID: 0009 |
| Certified Fee | 1.90 | |
| Return Receipt Fee (Endorsement Required) | 1.50 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | | Clerk: KZR4S8 |
| Total Postage & Fees | $ 5.84 | 03/28/01 |

Recipient's Name (Please Print Clearly) (To be completed by mailer) Robert Murphy
Street, Apt. No.; or PO Box No. 18 Chestnut
City, State, ZIP+4 Worcester, MA. 01608

PS Form 3800, February 2000 See Reverse for Instructions

SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:
Robert F. Murphy
UNUM Provident Corp
18 Chestnut St.
Worcester MA 01608

COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly) B. Date of Delivery 3-29-01

C. Signature
X Jayne Leardi ☐ Agent ☐ Addressee

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☒ Certified Mail ☐ Express Mail
☐ Registered ☐ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number (Copy from service label)
7000 0520 0024 9415 8487

PS Form 3811, July 1999 Domestic Return Receipt 102595-00-M-0952

Case 3:05-cv-30047-MAP Document 13-2 Filed 09/12/2005 Page 9 of 19

# EXHIBIT B

Case 3:05-cv-30047-MAP Document 13-2 Filed 09/12/2005 Page 10 of 19

## ATTENDING PHYSICIAN'S STATEMENT

Patient's name Carl Augsberger, Sr. Date you first treated patient for this condition 3/25/1997

Nature of sickness or injury. (Describe complications if any) Clinical Depression / Generalized Anxiety Disorder

Dates of treatment (since last report) May 25, 2001 Office yes

Hospital

How long will patient be unable to work in his/her occupation? From March 25, Year of 1992, to present, Year of

How long will patient be unable to work in any occupation? From presently working, Year of different, to question, Year of

Partially disabled From March 25, Year of 1992, to present, Year of

What is the prognosis for your patient? Guarded and uncertain

When do you feel patient could resume some work? presently working at [illegible]

Work without restriction? Probably Never

Do you feel your patient is a candidate for vocational rehabilitation? ☐ Yes ☐ No Unclear

Doctor's Name [signature] (Signature of Attending Physician) Kevin Edward Schmidt Dated June 13, Year of 2001

Street 300 State St, #063 City Springfield State MA Zip Code 01105-3[illegible]

Phone No. (413) 736-1569 Signed [signature] (Signature of Attending Physician) (Degree)

**MONTHLY PROGRESS REPORT**
**PLEASE NOTE – THIS FORM SHOULD BE COMPLETED AND RETURNED TO US ON OR ABOUT THE SAME DATE EACH MONTH.**

If you have any questions or concerns about the monthly completion of this claim form, please contact us at 1-800-633-7506.

Any person who knowingly and with intent to defraud any insurance company or other person files a statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

**PLEASE RETURN THIS TO:**
THE PAUL REVERE LIFE INSURANCE COMPANY
NEW YORK LIFE CUSTOMER CARE CENTER
P.O. BOX 15001
WORCESTER, MASSACHUSETTS 01615-9905

/2005 Page 11 of 19

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Unum Provident Corp.
Quality Performance Support Unit
Worcester Customer Care Center
18 Chestnut Street
Worcester, MA 01608

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X
☐ Agent
☐ Addressee

B. Received by (Printed Name)

C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☒ Certified Mail ☐ Express Mail
☐ Registered ☐ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number (Transfer from service label) 7002 2030 0003 0665 5555

PS Form 3811, August 2001 Domestic Return Receipt 102595-01-M-2509

# EXHIBIT C

Case 3:05-cv-30047-MAP Document 13-2 Filed 09/12/2005 Page 13 of 19

THOMAS A. KENEFICK, III, P.C.
ATTORNEY AT LAW
73 CHESTNUT STREET
SPRINGFIELD, MA 01103
E-MAIL: tak3@att.net
TELEPHONE (413) 734-7000 • FAX (413) 731-1302

JOYCE L. KORONA
Paralegal
ELAINE M. O'DONNELL
Paralegal

MARY H. PATRYN, ESQ.
Of Counsel

August 10, 2004

Unum Provident Corporation
Quality Performance Support Unit
Worcester Customer Care Center
18 Chestnut Street
Worcester, MA 01608

RE: Carl Augsberger

Dear Sir/Madam:

This office has been retained to represent Mr. Augsberger in he intends to file against you for, inter alia, violation of M.G.L. c. 93A, the Massachusetts Consumer Protection Statute, and breach of contract. Please consider this letter to be a formal demand for relief pursuant to M.G.L. c. 93A, §9.

Mr. Augsberger and New York Life[1] entered into a contract for disability income insurance on August 14, 1991. Pertinent and material provisions include the following:

- Unrestricted Own Occupation (UOO)
- Cost of Living Benefit (COLB)
- Residual Disability and
- Primary Automatic Benefit Increase (PABI) and
- Waiver of Premium Benefit

For these provisions, and indeed, for the insurance coverage generally, Mr. Augsberger paid a premium of $2,473.00 per year. In return, Unum promised to provide to Mr. Augsberger monthly benefits in the event of a total disability of $5,000.00. Also, in the event that Mr. Augsberger, due to a disability, could not realize the monthly income he had realized when he was not disabled, Unum would provide a residual benefit to supplement Mr. Augsberger's monthly income to bring the total up to $5,000.00.

[1]The management of Mr. Augsberger's insurance program under New York Life was subsequently transferred to Unum, see Correspondence by Unum dated August 21, 2000. The transaction did not affect the material terms of the insurance contract with Mr. Augsberger.

Case 3:05-cv-30047-MAP Document 13-2 Filed 09/12/2005 Page 14 of 19

In April, 1997, Mr. Augsberger submitted a claim for disability. At that time, he was undergoing essentially a nervous breakdown related to his job. He was suffering from several ailments including but not limited to depression and anxiety disorder.

Soon after he submitted his claim, New York Life requested that he provide certain information to process his claim. These items included a supplemental claim form, 1996 and 1997 tax forms, copies of fax filing extensions, information on the workers compensation claim and copies of any related documents, an explanation of the BuSpar medication and information on the prescribing physician, a supplemental claim form from Mr. Augsberger's physician, information regarding whether he had received any salary continuation benefits, and specific dates.

Approximately seven months later, Mr. Augsberger received yet another request for information. This request was for information regarding the last date he worked; a detailed and lengthy form for him to complete entitled "Description of Occupation"; a request for an explanation of why Mr. Augsberger "waited" seven months to file his claim instead of the specified 30 days in the policy; complete copies of tax returns for 1990, 1991 and 1996 including schedules and attachments, W-2's and 1099's; a copy of the workers compensation application for benefits; a supplemental claim form from Mr. Augsberger; and a supplemental claim for from his physician.

Mr. Augsberger forwarded the requested information within one month.

Approximately one month later, New York Life again submitted a detailed list of items it was requesting in order to process Mr. Augsberger's claim. This list included a request for medical records from Mr. Augsberger's treating physician, Dr. Kevin Schmidt along with an evaluation form; an evaluation form from Mr. Augsberger's psychologist, Dr. Mark Elin; additional information from his then-employer, Penske Truck Leasing; a copy of the workers compensation decision; supplemental claim form from Dr. Schmidt; and copies of Mr. Augsberger's 1996 and 1997 tax forms. Within one month, Mr. Augsberger provided the requested information.

Almost one year after Mr. Augsberger had first submitted his claim, New York Life, apparently still processing his request for benefits, sent a third request for information in March, 1998. This time, New York Life sought medical records from Dr. Elin; medical records from Dr. Schmidt; an additional form to be completed by Dr. Schmidt; a copy of the workers compensation denial of benefits letter; and a supplemental claim form from Dr. Schmidt. New York Life also informed Mr. Augsberger that it would have a consulting psychiatrist review his claim after it had received the foregoing.

After waiting almost one year, Mr. Augsberger received the news that New York Life would pay benefits from April 14, 1997 through January 10, 1998 (less the 180 day waiting period.) However, regarding benefits for subsequent months, it was requesting additional information, including Mr. Augsberger's medical records in connection with his treatment with Dr. Schmidt from the time he first saw Dr. Schmidt. These records

predated Mr. Augsberger's claim of April, 1997. A month later, New York Life again requested this information. After not receiving such information again in June, 1998, New York Life closed the claim in August, 1998.

The claim was reopened. New York Life submitted yet another substantial request for information including, but not limited to, a completed Form 1 from Mr. Augsberger; completed Form 2 from Dr. Schmidt; tax returns for 1998 including all schedules and attachments; and a detailed narrative of Mr. Augsberger's home and work life since January 1998. On March 28, 2000, Mr. Augsberger submitted the "Insured's Supplementary Statement of Claim" form.

New York Life followed up its request in August, 2000, wherein it requested the following to reopen Mr. Augsberger's claim: a complete and detailed reply to its letter dated October 15,.1998; a statements regarding Mr. Augsberger's salary continuation benefits; a status report on the appeal of the workers compensation denial; copies of the tax returns for 1996, 1997, 1998 and 1999; the name, address and phone number of the physician who prescribed BuSpar; Form 1 from Mr. Augsberger; Form 2 from each physician; a detailed account of any work performed by Mr. Augsberger; a completed "Description of Occupation" form; a detailed narrative of Mr. Augsberger's life since January 1998; and Dr. Schmidt's entire medical file regarding Mr. Augsberger.

In September, 2000, Unum sent another letter requesting Mr. Augsberger's response to New York Life's letter of August, 2000. Mr. Augsberger replied and provided the requested information. Despite this, Unum again requested additional information in a letter dated October 4, 2000. It now wanted the following: copies of Schedule C and personal tax returns; updated medical records from Dr. Schmidt and any other doctor Mr. Augsberger had seen since 1997; since Dr. Schmidt had indicated that Mr. Augsberger was completely disabled from October 3, 1998 to October 4, 2000, Unum also requested monthly profit and loss statements from October 1, 1998 through October 4, 2000; a status report on the appeal of the workers compensation denial; complete copies of business and personal tax returns for 1999 including all schedules and attachments; the name of the physician who prescribed BuSpar; a completed "Daily Activities" form; and continuing monthly progress reports. Additionally, Unum expressed that it could not understand the reasons for why Mr. Augsberger could not return to work in a full time capacity in his occupation. In January, 2001, Unum also wrote directly to Dr. Schmidt requesting medical records and Psychiatric Assessment Forms.

In response to a March, 2001, visit by a Unum field representative, Robert Murphy, Mr. Augsberger forwarded (within two days) information regarding all medications he was taking for treatment. On March 29, 2001, Unum received by certified mail, a completed "Psychiatric Assessment Form" in which Dr. Schmidt unequivocally stated Mr. Augsberger's latest visit with him was March 28, 2001; that Mr. Augsberger continued to suffer from clinical depression and generalized anxiety disorder; and that he was being treated with Wellbutrin, Buspar, among other prescription medications. Dr. Schmidt stated that:

> Patient was CLEARLY totally disabled for all types of employment from Spring 1997 [through] Fall 1998. Patient was then able to begin work in a different, but related field of truck repair. However, given the permanent [impairment?] to self-esteem, concentration, attention span, patient will continue to be disabled from returning to his previous position, or its type, in corporate leasing/sales.

Dr. Schmidt also noted that "patient will be unable to return to high-pressure corporate environment at work, indefinitely" (his regular job) (see **Regular job**, defined in the Unum insurance policy: "The occupation, or occupations if more than one, in which the Insured is engaged when a disability starts"); and this determination was based upon Mr. Augsberger's condition of significant depression and anxiety that prevents him from returning to such a position. Further, "his level of psychological impairment and type, continue to disable him from his previous type of employment and income level." See **Total disability**, defined by the policy, "means that the Insured can not do the substantial and material duties of his or her regular job. The cause of the total disability must be an injury or a sickness.") (See also **Residual Disability**: "During the Elimination Period, residual disability means that due to an injury or a sickness as defined in this policy, the Insured: (1) is not able to do one or more of the substantial and material duties of his or her regular job; or (2) directly and apart from any other cause, has a loss of income as defined in this rider of at least 20%. After the Elimination Period has been satisfied, residual disability means the Insured has a loss of income as defined in this rider of at least 20%. The loss of income must result directly from the same or related injury or sickness used to satisfy the Elimination Period. The loss of income must not result from any other cause.") See Dr. Schmidt's evaluation, attached hereto as Exhibit "A".

On April 18, 2001, Unum informed Mr. Augsberger that it had given Dr. Schmidt's letters to its in house psychiatric consultant for review. Additionally, Unum requested from Mr. Augsberger an updated progress report, along with an updated progress report from Mr. Augsberger's physician, and all information requested in its letter dated October 4, 2000. Later that month, Unum again sent a letter seeking more treatment notes from Dr. Schmidt. On April 26, 2001, Dr. Schmidt forwarded the requested information.

On May 2, 2001, Unum paid benefits for January 11, 1998 through June 11, 2000. On June 12, 2001, Unum requested updated medical forms from Dr. Schmidt and Dr. Elin, and sought a progress report from Mr. Augsberger and Dr. Schmidt, respectively.

In or around June 13, 2001, Dr. Schmidt submitted an "Attending Physician's Statement" which stated that Mr. Augsberger would probably never be able to work without restriction. See Exhibit "B", attached hereto.

On June 20, 2001, Mr. Augsberger submitted yet another Progress Report to Unum.

Unum requested more information in its letter dated July 6, 2001. Specifically, it sought more medical documentation from Dr. Schmidt and Dr. Elin, monthly progress reports from both Mr. Augsberger and Dr. Schmidt; and both business and personal tax returns for the year 2000. Unum followed up this request a little more than one month later and stated that Drs. Schmidt and Elin had not responded to its request for information, and again requested the 2000 business and tax returns.

Finally, on September 25, 2001, Unum informed Mr. Augsberger that it was rejecting his claim for either total or residual disability. This rejection was ostensibly based upon its determination, despite the recent reports from Dr. Schmidt, that Unum's "in-house psychiatric consultant" reviewed Mr. Augsberger's file and Unum determined that "there does not appear to be sufficient documentation that would limit or restrict your ability to perform the duties of your occupation on a full-time basis."

Moreover, in support of its denial, Unum referenced a stale (dated February 15, 1998) evaluation report by Dr. Elin indicating that Mr. Augsberger could perform all of his occupational duties, just not "at Penske." Unum apparently ignored the more recent reports by Dr. Schmidt which steadfastly maintained that Mr. Augsberger remained disabled from his former occupation and which indicated that Mr. Augsberger continued to treat under Dr. Schmidt's care (with regular visits) regarding his disability, indeed as acknowledged by Unum, as late as May 25, 2001. (See **Injury and Sickness**, as defined in Unum's insurance policy in pertinent part: "Sickness means an illness or disease of the Insured which would cause a prudent person to seek medical attention. ... The injury or sickness must not be self-inflicted on purpose. The injury or sickness must be one which *requires and receives regular care by a Physician.*" (Emphasis added.)

Unum's reliance on Dr. Elin's evaluation, and disregard of Dr. Schmidt's more recent evaluations was even more surprising to Mr. Augsberger, especially because earlier, in a correspondence dated March 11, 1998, Unum had indicated that "Dr. Schmidt is the physician certifying your disability." (See **Physician**, as defined in Unum's policy as "A licensed practitioner of the healing arts acting within the scope of his or her license in treating an injury or a sickness.") Thus, at the very least, Unum should have paid heed to Dr. Schmidt's evaluation over that of Dr. Elin.

Mr. Augsberger proceeded to request his entire file at Unum. On May 30, 2002, Unum responded by producing selected documents, but not the entire file. Mr. Augsberger again requested that Unum reopen his claim.

On December 13, 2002, Unum requested more information. This time, the list included requests for copies of medical records from Dr. Schmidt from March 27, 2001 to the present; medical records from Dr. Elin; the name of the physician Mr. Augsberger had consulted in November, 2002; copies of both business and personal tax returns for 2000 and 2001; monthly profit and loss statements for the entire year of 2002; and another completed claim form.

Case 3:05-cv-30047-MAP Document 13-2 Filed 09/12/2005 Page 18 of 19

On February 14, 2003, Unum notified Mr. Augsberger that it was rejecting his claim for residual disability. This rejection was apparently based on an improved diagnosis of Mr. Augsberger's adjustment disorder, despite Dr. Schmidt's reports that Mr. Augsberger continues to suffer from clinical depression and generalized anxiety disorder. The letter informed Mr. Augsberger that if he did not submit an appeal within 90 days, Unum's decision would be final.

On May 13, 2003, Mr. Augsberger sent a written appeal to Unum. On December 19, 2003, Unum rejected the appeal. This rejection was also based on in-house psychiatric and physician's reports contrary to the evaluations done by Drs. Elin and Schmidt.

Your use of the foregoing improper insurance claim settlement practices including, inter alia: failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies; failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies; refusing to pay claims without conducting a reasonable investigation based upon all available information; failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed; failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds; and attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application; constitute a violation of M.G.L. c. 176D, and are therefore a violation of M.G.L. c. 93A.

It is my opinion that the foregoing amply demonstrates that you have violated Chapter 93A in failing to practice proper insurance claim evaluation practices, and breached your contract with Mr. Augsberger. Therefore, this is a demand for relief requesting that all past, present, and future benefits owed Mr. Augsberger be paid.

This is also a demand for $5,000 in legal fees incurred by Mr. Augsberger in seeking relief for damages resulting from your palpably inappropriate and illegal insurance claim evaluation practices.

Please note that, pursuant to the provisions of M.G.L. c. 93A, you are required to make a reasonable offer of settlement within thirty days of your receipt of this letter. If I do not receive a reasonable offer of settlement at that time, my client has authorized me to pursue all available remedies including a civil action in the Superior Court of Massachusetts for violation of M.G.L. c. 93A, and other counts. You should further be advised that should a court make a finding against you and in the event you have not complied with the statute's requirement of tendering a reasonable offer of settlement that the Court shall, after determining my client's actual damages, and least double and may treble the same as well as enter an award of reasonable attorney's fees.

Thus, I look forward to your reply.

Sincerely,

THOMAS A. KENEFICK, III

# EXHIBIT D

THOMAS A. KENEFICK, III, P.C.
ATTORNEY AT LAW
73 CHESTNUT STREET
SPRINGFIELD, MA 01103
E-MAIL: tak3@att.net
TELEPHONE (413) 734-7000 • FAX (413) 731-1302

JOYCE L. KORONA
Paralegal
ELAINE M. O'DONNELL
Paralegal

MARY H. PATRYN, *ESQ.*
Of Counsel

April 15, 2005

New York Life Insurance Company
51 Madison Avenue
Suite 3200 New York, NY 10010

RE: Carl Augsberger

Dear Sir/Madam:

This office has been retained to represent Mr. Augsberger in he intends to file against you for, inter alia, violation of M.G.L. c. 93A, the Massachusetts Consumer Protection Statute, and breach of contract. Please consider this letter to be a formal demand for relief pursuant to M.G.L. c. 93A, §9.

Mr. Augsberger and New York Life entered into a contract for disability income insurance on August 14, 1991. New York Life entered into a reinsurance agreement with Paul Revere, a subsidiary of Unum Provident, under which Paul Revere administers and services, as an agent for New York Life, its individual disability income policies. Accordingly, it is my opinion that New York Life, Paul Revere, and Unum Provident are each liable for their actions as individuals, and are additionally liable through their agency relationships with each other. The transaction did not affect the material terms of the insurance contract. Pertinent and material provisions include the following:

- Unrestricted Own Occupation (UOO)
- Cost of Living Benefit (COLB)
- Residual Disability and
- Primary Automatic Benefit Increase (PABI) and
- Waiver of Premium Benefit

For these provisions, and indeed, for the insurance coverage generally, Mr. Augsberger paid a premium of $2,473.00 per year. In return, Unum promised to provide to Mr. Augsberger monthly benefits in the event of a total disability of $5,000.00. Also, in the event that Mr. Augsberger, due to a disability, could not realize the monthly income he had realized when he was not disabled, Unum would provide a residual benefit to supplement Mr. Augsberger's monthly income to bring the total up to $5,000.00.

In April, 1997, Mr. Augsberger submitted a claim for disability. At that time, he was undergoing essentially a nervous breakdown related to his job. He was suffering

from several ailments including but not limited to depression and anxiety disorder.

Soon after he submitted his claim, New York Life requested that he provide certain information to process his claim. These items included a supplemental claim form, 1996 and 1997 tax forms, copies of fax filing extensions, information on the workers compensation claim and copies of any related documents, an explanation of the BuSpar medication and information on the prescribing physician, a supplemental claim form from Mr. Augsberger's physician, information regarding whether he had received any salary continuation benefits, and specific dates.

Approximately seven months later, Mr. Augsberger received yet another request for information. This request was for information regarding the last date he worked; a detailed and lengthy form for him to complete entitled "Description of Occupation"; a request for an explanation of why Mr. Augsberger "waited" seven months to file his claim instead of the specified 30 days in the policy; complete copies of tax returns for 1990, 1991 and 1996 including schedules and attachments, W-2's and 1099's; a copy of the workers compensation application for benefits; a supplemental claim form from Mr. Augsberger; and a supplemental claim for from his physician.

Mr. Augsberger forwarded the requested information within one month.

Approximately one month later, New York Life again submitted a detailed list of items it was requesting in order to process Mr. Augsberger's claim. This list included a request for medical records from Mr. Augsberger's treating physician, Dr. Kevin Schmidt along with an evaluation form; an evaluation form from Mr. Augsberger's psychologist, Dr. Mark Elin; additional information from his then-employer, Penske Truck Leasing; a copy of the workers compensation decision; supplemental claim form from Dr. Schmidt; and copies of Mr. Augsberger's 1996 and 1997 tax forms. Within one month, Mr. Augsberger provided the requested information.

Almost one year after Mr. Augsberger had first submitted his claim, New York Life, apparently still processing his request for benefits, sent a third request for information in March, 1998. This time, New York Life sought medical records from Dr. Elin; medical records from Dr. Schmidt; an additional form to be completed by Dr. Schmidt; a copy of the workers compensation denial of benefits letter; and a supplemental claim form from Dr. Schmidt. New York Life also informed Mr. Augsberger that it would have a consulting psychiatrist review his claim after it had received the foregoing.

After waiting almost one year, Mr. Augsberger received the news that New York Life would pay benefits from April 14, 1997 through January 10, 1998 (less the 180 day waiting period.) However, regarding benefits for subsequent months, it was requesting additional information, including Mr. Augsberger's medical records in connection with his treatment with Dr. Schmidt from the time he first saw Dr. Schmidt. These records predated Mr. Augsberger's claim of April, 1997. A month later, New York Life again requested this information. After not receiving such information again in June, 1998,

New York Life closed the claim in August, 1998.

The claim was reopened. New York Life submitted yet another substantial request for information including, but not limited to, a completed Form 1 from Mr. Augsberger; completed Form 2 from Dr. Schmidt; tax returns for 1998 including all schedules and attachments; and a detailed narrative of Mr. Augsberger's home and work life since January 1998. On March 28, 2000, Mr. Augsberger submitted the "Insured's Supplementary Statement of Claim" form.

New York Life followed up its request in August, 2000, wherein it requested the following to reopen Mr. Augsberger's claim: a complete and detailed reply to its letter dated October 15, 1998; a statements regarding Mr. Augsberger's salary continuation benefits; a status report on the appeal of the workers compensation denial; copies of the tax returns for 1996, 1997, 1998 and 1999; the name, address and phone number of the physician who prescribed BuSpar; Form 1 from Mr. Augsberger; Form 2 from each physician; a detailed account of any work performed by Mr. Augsberger; a completed "Description of Occupation" form; a detailed narrative of Mr. Augsberger's life since January 1998; and Dr. Schmidt's entire medical file regarding Mr. Augsberger.

In September, 2000, Unum sent another letter requesting Mr. Augsberger's response to New York Life's letter of August, 2000. Mr. Augsberger replied and provided the requested information. Despite this, Unum again requested additional information in a letter dated October 4, 2000. It now wanted the following: copies of Schedule C and personal tax returns; updated medical records from Dr. Schmidt and any other doctor Mr. Augsberger had seen since 1997; since Dr. Schmidt had indicated that Mr. Augsberger was completely disabled from October 3, 1998 to October 4, 2000, Unum also requested monthly profit and loss statements from October 1, 1998 through October 4, 2000; a status report on the appeal of the workers compensation denial; complete copies of business and personal tax returns for 1999 including all schedules and attachments; the name of the physician who prescribed BuSpar; a completed "Daily Activities" form; and continuing monthly progress reports. Additionally, Unum expressed that it could not understand the reasons for why Mr. Augsberger could not return to work in a full time capacity in his occupation. In January, 2001, Unum also wrote directly to Dr. Schmidt requesting medical records and Psychiatric Assessment Forms.

In response to a March, 2001, visit by a Unum field representative, Robert Murphy, Mr. Augsberger forwarded (within two days) information regarding all medications he was taking for treatment. On March 29, 2001, Unum received by certified mail, a completed "Psychiatric Assessment Form" in which Dr. Schmidt unequivocally stated Mr. Augsberger's latest visit with him was March 28, 2001; that Mr. Augsberger continued to suffer from clinical depression and generalized anxiety disorder; and that he was being treated with Wellbutrin, Buspar, among other prescription medications. Dr. Schmidt stated that:

> Patient was CLEARLY totally disabled for all types of employment from Spring

> 1997 [through] Fall 1998. Patient was then able to begin work in a different, but related field of truck repair. However, given the permanent [impairment?] to self-esteem, concentration, attention span, patient will continue to be disabled from returning to his previous position, or its type, in corporate leasing/sales.

Dr. Schmidt also noted that "patient will be unable to return to high-pressure corporate environment at work, indefinitely" (his regular job) (see **Regular job**, defined in the Unum insurance policy: "The occupation, or occupations if more than one, in which the Insured is engaged when a disability starts"); and this determination was based upon Mr. Augsberger's condition of significant depression and anxiety that prevents him from returning to such a position. Further, "his level of psychological impairment and type, continue to disable him from his previous type of employment and income level." See **Total disability**, defined by the policy, "means that the Insured can not do the substantial and material duties of his or her regular job. The cause of the total disability must be an injury or a sickness.") (See also **Residual Disability**: "During the Elimination Period, residual disability means that due to an injury or a sickness as defined in this policy, the Insured: (1) is not able to do one or more of the substantial and material duties of his or her regular job; or (2) directly and apart from any other cause, has a loss of income as defined in this rider of at least 20%. After the Elimination Period has been satisfied, residual disability means the Insured has a loss of income as defined in this rider of at least 20%. The loss of income must result directly from the same or related injury or sickness used to satisfy the Elimination Period. The loss of income must not result from any other cause.") See Dr. Schmidt's evaluation, attached hereto as Exhibit "A".

On April 18, 2001, Unum informed Mr. Augsberger that it had given Dr. Schmidt's letters to its in house psychiatric consultant for review. Additionally, Unum requested from Mr. Augsberger an updated progress report, along with an updated progress report from Mr. Augsberger's physician, and all information requested in its letter dated October 4, 2000. Later that month, Unum again sent a letter seeking more treatment notes from Dr. Schmidt. On April 26, 2001, Dr. Schmidt forwarded the requested information.

On May 2, 2001, Unum paid benefits for January 11, 1998 through June 11, 2000. On June 12, 2001, Unum requested updated medical forms from Dr. Schmidt and Dr. Elin, and sought a progress report from Mr. Augsberger and Dr. Schmidt, respectively.

In or around June 13, 2001, Dr. Schmidt submitted an "Attending Physician's Statement" which stated that Mr. Augsberger would probably never be able to work without restriction. See Exhibit "B", attached hereto.

On June 20, 2001, Mr. Augsberger submitted yet another Progress Report to Unum.

Unum requested more information in its letter dated July 6, 2001. Specifically, it

sought more medical documentation from Dr. Schmidt and Dr. Elin, monthly progress reports from both Mr. Augsberger and Dr. Schmidt; and both business and personal tax returns for the year 2000. Unum followed up this request a little more than one month later and stated that Drs. Schmidt and Elin had not responded to its request for information, and again requested the 2000 business and tax returns.

Finally, on September 25, 2001, Unum informed Mr. Augsberger that it was rejecting his claim for either total or residual disability. This rejection was ostensibly based upon its determination, despite the recent reports from Dr. Schmidt, that Unum's "in-house psychiatric consultant" reviewed Mr. Augsberger's file and Unum determined that "there does not appear to be sufficient documentation that would limit or restrict your ability to perform the duties of your occupation on a full-time basis."

Moreover, in support of its denial, Unum referenced a stale (dated February 15, 1998) evaluation report by Dr. Elin indicating that Mr. Augsberger could perform all of his occupational duties, just not "at Penske." Unum apparently ignored the more recent reports by Dr. Schmidt which steadfastly maintained that Mr. Augsberger remained disabled from his former occupation and which indicated that Mr. Augsberger continued to treat under Dr. Schmidt's care (with regular visits) regarding his disability, indeed as acknowledged by Unum, as late as May 25, 2001. (See **Injury and Sickness**, as defined in Unum's insurance policy in pertinent part: "Sickness means an illness or disease of the Insured which would cause a prudent person to seek medical attention. ... The injury or sickness must not be self-inflicted on purpose. The injury or sickness must be one which *requires and receives regular care by a Physician*." (Emphasis added.)

Unum's reliance on Dr. Elin's evaluation, and disregard of Dr. Schmidt's more recent evaluations was even more surprising to Mr. Augsberger, especially because earlier, in a correspondence dated March 11, 1998, Unum had indicated that "Dr. Schmidt is the physician certifying your disability." (See **Physician**, as defined in Unum's policy as "A licensed practitioner of the healing arts acting within the scope of his or her license in treating an injury or a sickness.") Thus, at the very least, Unum should have paid heed to Dr. Schmidt's evaluation over that of Dr. Elin.

Mr. Augsberger proceeded to request his entire file at Unum. On May 30, 2002, Unum responded by producing selected documents, but not the entire file. Mr. Augsberger again requested that Unum reopen his claim.

On December 13, 2002, Unum requested more information. This time, the list included requests for copies of medical records from Dr. Schmidt from March 27, 2001 to the present; medical records from Dr. Elin; the name of the physician Mr. Augsberger had consulted in November, 2002; copies of both business and personal tax returns for 2000 and 2001; monthly profit and loss statements for the entire year of 2002; and another completed claim form.

On February 14, 2003, Unum notified Mr. Augsberger that it was rejecting his claim for residual disability. This rejection was apparently based on an improved

diagnosis of Mr. Augsberger's adjustment disorder, despite Dr. Schmidt's reports that Mr. Augsberger continues to suffer from clinical depression and generalized anxiety disorder. The letter informed Mr. Augsberger that if he did not submit an appeal within 90 days, Unum's decision would be final.

On May 13, 2003, Mr. Augsberger sent a written appeal to Unum. On December 19, 2003, Unum rejected the appeal. This rejection was also based on in-house psychiatric and physician's reports contrary to the evaluations done by Drs. Elin and Schmidt.

Your use of the foregoing improper insurance claim settlement practices including, inter alia: failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies; failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies; refusing to pay claims without conducting a reasonable investigation based upon all available information; failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed; failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds; and attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application; constitute a violation of M.G.L. c. 176D, and are therefore a violation of M.G.L. c. 93A.

It is my opinion that the foregoing amply demonstrates that you have violated Chapter 93A in failing to practice proper insurance claim evaluation practices, and breached your contract with Mr. Augsberger. Therefore, this is a demand for relief requesting that all past, present, and future benefits owed Mr. Augsberger be paid.

This is also a demand for $5,000 in legal fees incurred by Mr. Augsberger in seeking relief for damages resulting from your palpably inappropriate and illegal insurance claim evaluation practices.

Please note that, pursuant to the provisions of M.G.L. c. 93A, you are required to make a reasonable offer of settlement within thirty days of your receipt of this letter. If I do not receive a reasonable offer of settlement at that time, my client has authorized me to pursue all available remedies including a civil action in the Superior Court of Massachusetts for violation of M.G.L. c. 93A, and other counts. You should further be advised that should a court make a finding against you and in the event you have not complied with the statute's requirement of tendering a reasonable offer of settlement that the Court shall, after determining my client's actual damages, and least double and may treble the same as well as enter an award of reasonable attorney's fees.

Thus, I look forward to your reply.

Sincerely,

THOMAS A. KENEFICK, III

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

New York Life Insurance Company
51 Madison Avenue
Suite 1200
New York, NY 10010

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X [signature]
☐ Agent
☐ Addressee

B. Received by ( *Printed Name)*

C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☒ Certified Mail ☐ Express Mail
☐ Registered ☐ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? *(Extra Fee)* ☐ Yes

2. Article Number
*(Transfer from service label)*
7002 2030 0003 0665 5760

PS Form 3811, August 2001 Domestic Return Receipt 102595-01-M-2509